Peter **GRAUPNER**, Jamie Griffin, and Kenneth Hayes, Plaintiffs,

v.

**TOWN OF BROOKFIELD**, Chief of Police Ross Ackerman, David Churchy, James Lamothe, Derek Curchaine, Ronald Dackson, Floyd Moores, Albert Little, and Michael Seery, Defendants.

Civil Action No. 02–40202–FDS.

United States District Court, D. Massachusetts.

Aug. 9, 2006.

R. Michael Brown, Lead Attorney, Southboro, MA, for Plaintiffs.

Nancy Frankel Pelletier Robinson Donovan, PC, Springfield, MA, for Defendants.

*MEMORANDUM AND ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AS TO PETER GRAUPNER*

SAYLOR, District Judge.

This is a civil action for money damages brought by three police officers pursuant to 42 U.S.C. § 1983 for alleged violation of their constitutional rights and for various state law claims. Defendants have moved for summary judgment as to certain claims brought by plaintiff Peter Graupner on the grounds that he failed to disclose them in a prior bankruptcy proceeding and therefore lacks standing to assert the claims, and, in the alternative, should be judicially estopped from asserting them in this Court.

For the reasons below, the Court agrees that the claims were not disclosed in the bankruptcy proceeding, and therefore were not abandoned by the trustee and remain the property of the bankruptcy estate. This litigation will be stayed for 60 days to provide the bankruptcy court with an opportunity to take any action it deems appropriate. The Court will order such further relief as may be just and proper after that time.

## I. *Factual Background*

The following facts are set forth in the light most favorable to the plaintiff.

### A. *Graupner's Union Activity and Termination*

Peter Graupner was employed by the Town of Brookfield as a police officer from 1993 until November 30, 1999. In February 1999, Graupner and Jamie Griffin, a fellow officer, met with officials from the Massachusetts Coalition of Police ("MASSCOP"), a labor union for police officers, to discuss organizing a union within the Brookfield Police Department. On October 9, 1999, Graupner, Griffin, and Kenneth Hayes (also a police officer) distributed union authorization cards to the officers on duty at a local fair; each officer present signed a card except Ross Ackerman. On October 20, 1999, MASSCOP sent a letter of recognition to the Brookfield Board of Selectmen, informing them that it was representing the officers as their collective bargaining agent.

The Board of Selectmen has sole authority to reappoint or terminate police officers. At that time, it was comprised of Floyd Moores (the Chairman), Ronald Dackson, and Michael Seery. On October 26, 1999, Graupner attended a Board of Selectmen meeting regarding his reappointment. Chairman Moores read the

MASSCOP letter aloud to begin the meeting. Acting Police Chief Victor Boucher then presented a letter of recommendation in support of Graupner's reappointment. However, the Board placed Graupner on paid administrative leave until November 30, 1999—citing "public safety issues"—at which time his appointment would be terminated.[1]

After being requested to do so, Graupner returned all Brookfield Police Department property in his possession on November 2, 1999. Nevertheless, that same day, Ackerman—who had been newly appointed as Acting Police Chief—signed an affidavit stating that Graupner was a "public threat" in possession of two police department handguns. This affidavit was the basis of a proceeding against Graupner in the Worcester Superior Court, which was subsequently dismissed. Graupner contends that this sequence of events embarrassed and humiliated him.

On November 14, 1999, Chief Ackerman and Officer Churchy, along with a state trooper, detained all three plaintiffs as they were attempting to gather signatures of support within the community. That same day, Ackerman and Churchy searched Griffin's parked car, which contained information concerning their union activities.[2]

## B. *The MLRC Proceeding*

On November 15, 1999, plaintiffs filed a complaint with the Massachusetts Labor Relations Commission ("MLRC") alleging that the Town had terminated their employment in retaliation for their efforts to organize a union in violation of Mass. Gen. Laws ch. 150E, §§ 10(a)(3) and 10(a)(1). The MLRC complaint demanded that the "charging parties [be made] whole by reinstating them and restoring to them all benefits lost." Thus, the complaint clearly sought monetary relief in addition to reinstatement.

## C. *The Bankruptcy Proceeding*

On June 7, 2000, Graupner and his wife, Deborah, filed a voluntary petition for bankruptcy. Under bankruptcy court procedures, they were required to make complete disclosures of their assets and liabilities. Among other things, Schedule B required them to list any "other contingent and unliquidated claims of every nature." Although the MLRC claim sought monetary relief, and had been pending for more than six months at that point, the Graupners did not disclose it. The Graupners likewise did not disclose any potential civil rights claims they may have had. On July 10, 2000, the Graupners requested and obtained leave to amend certain schedules, including Schedule B; however, they again failed to include both the MLRC claim and any civil rights claims.

The case was deemed to be a "no-asset" case, and the bankruptcy court discharged the Graupners on September 12, 2000. Several days later, the court closed the case and discharged the trustee.

1. Around the time of the meeting, Selectman Dackson allegedly told Graupner, "It wasn't smart to start a union so close to your appointment. Unions are trouble ... you are trouble ... and you won't be around to enjoy the union."

2. Graupner also alleges that during the period between November 15, 1999 and March 2000, various defendant officers (1) interrupted a talk he was giving to the Girl Scouts and illegally detained and humiliated him; (2) served a grand jury subpoena demanding his payroll records from an employer where he worked at a second job; and (3) in a telephone conversation with his new employer, referred to him as a "thief" and "criminal" and recommended that his employment be terminated.

### D. The Alleged Traffic Incident and Subsequent Prosecution

On October 21, 2000, at about 10:45 p.m., Graupner was driving home from work through Brookfield, headed toward West Brookfield where he lived. He passed Brookfield police officers Derek Curchaine and James Lamothe, who were in their cruiser. They radioed West Brookfield police officers and instructed them to pull over and detain Graupner. The West Brookfield officers complied and detained him until Curchaine and Lamothe arrived. Chief Ackerman then arrived and issued Graupner a citation for speeding. Six days later, Graupner received citations issued by Lamothe for "operating to endanger" and for operating an "unregistered motor vehicle." Chief Ackerman then initiated a criminal complaint against Graupner for assault and battery with a dangerous weapon—that is, his automobile. The charges were reported in the local newspaper. Some of the charges were dismissed, but on January 3, 2002, the charges of assault and battery and speeding were tried to a jury. Graupner was acquitted of both charges. Graupner contends that his detention was illegal and that as a result of the incident he suffered extreme humiliation, emotional distress, financial loss, and a loss of respect in the community.

### E. MLRC's Ruling and Subsequent Events

On May 1, 2002, the MLRC issued a decision concluding that the Town had unlawfully retaliated against Graupner and the other officers for exercising their rights to support a union. It ordered the Town to reinstate them and to make them whole, with interest, for losses suffered as a result of its unlawful actions. The Supreme Judicial Court upheld the decision on appeal. *See Town of Brookfield v. Labor Relations Comm'n,* 443 Mass. 315, 821 N.E.2d 51 (2005).

After the MLRC's decision, and during the pendency of the appeal, the Town and Graupner's counsel exchanged letters regarding reinstatement and back pay. By letter dated October 23, 2002, the Town calculated the back pay owed to Graupner as $74,240.80, minus any amounts received in mitigation of his losses (presumably, compensation from other employment), for the period from November 30, 1999, until November 15, 2002. It also offered him a reinstatement date of November 18, 2002. If he did not wish reinstatement, it offered to settle the matter with him for an amount of $86,907.35, which it contended represented his back wages with interest, but without any offset. According to the Town, Graupner contended that the Town's calculations were in error and demanded an amount far in excess of the Town's offer. The parties never came to any agreement as to either the amount of back pay owed or for settlement, and Graupner has never collected any back pay from the award. Nonetheless, it is clear that the amount of back pay and interest owed to Graupner is substantial.[3]

### F. The Filing of this Lawsuit

In the meantime, on October 19, 2002, plaintiffs commenced an action in this Court. The complaint sets forth eight counts, as follows: (1) against Ackerman for deprivation of plaintiffs' First, Fourth, and Fourteenth Amendment rights under 42 U.S.C. § 1983; (2) against the Selectmen (Dackson, Seery, Moores, and Little) for retaliation against plaintiffs for exercising their First Amendment rights under § 1983; (3) against the Town for a policy

---

**3.** The Town contends that the award for back pay was "sufficient to satisfy his debts" in bankruptcy. There is no record evidence to verify this contention.

or custom of deliberate indifference to the civil rights of its citizens under § 1983; (4) against all defendants for conspiracy to retaliate against plaintiffs for exercising their First Amendment rights under § 1983 and in violation of the Massachusetts Civil Rights Act, Mass. Gen. Laws. ch. 12, § 111; (5) against Ackerman, Churchy, Lamothe, and Curchaine for deprivation of plaintiffs' First, Fourth, and Fourteenth Amendment rights under § 1983; (6) against Ackerman and Dackson for defamation; (7) against Ackerman, Curchaine, and Lamothe for abuse of process; and (8) against Ackerman, Curchaine, and Lamothe for malicious prosecution.

On May 25, 2005, Graupner was deposed. In the course of that deposition, defendants learned for the first time that he had filed for bankruptcy in June 2000. On August 12, 2005, defendants filed a motion for extension of time within which to file dispositive motions; in that motion, they specifically stated that they intended to challenge Graupner's standing to bring his claims due to his failure to disclose them in the bankruptcy court.

### G. *The Reopening of the Bankruptcy Proceeding*

On September 4, 2005—nearly five years after the case was closed—the Graupners filed a motion in the bankruptcy court to reopen their case and amend their disclosures. In that motion, Graupner stated that his prior failure to list the MLRC claim was "due to inadvertence and his belief that it was not an asset, but a claim for job reinstatement."

On September 19, the bankruptcy court reopened the case. On September 26, it allowed Graupner to amend his financial

disclosures. In his amended Schedule B, under the section requesting disclosure of "contingent and unliquidated claims of every nature" and the "estimated value of each," he stated as follows:

> Civil action for money damages: the debtor estimates the value as unknown: The claims [*sic*] originates from 1999 and was a claim filed with the Massachusetts Labor Relations Board [*sic*] regarding the debtor husband's claim for reinstatement as a police Sergeant with the Town of Brookfield and money damages were not requested: due to the passage of time, the debtor's claim for employment reinstatement has become impractical and now the debtor husband can only recover money damages. At the time of the filing of the bankruptcy case the debtor husband did not list this asset due [to] inadvertence and his belief that it was not an asset but a claim for job reinstatement.

Graupner thus did not advise the bankruptcy court that his claim with the MLRC had resulted in a May 2002 order in his favor that included back pay; that it had been upheld on appeal in 2005; or that he had been offered more than $86,000 in settlement, but had demanded a much higher amount. Nor did he differentiate between his MLRC claim for retaliation under state law (already finally decided in his favor) and his claims for civil rights violations (then, as now, pending in this Court).[4] Finally, his description was misleading, in that it states that he originally sought only "reinstatement" at the MLRC and that "money damages were not requested," when in fact he also sought "restoration of all benefits lost"—that is, back pay.

---

4. For the sake of simplicity, Graupner's claims in this Court will be referred to as his "civil rights claims," as distinct from his claims before the MLRC for reinstatement and back pay.

No new trustee was appointed. The bankruptcy court provided notice of the amendment to the creditors, but no creditors filed any objections or claims against the newly disclosed property. The case was then closed on November 29, 2005.

In the meantime, on October 5, 2005, defendants filed for summary judgment as to all claims brought by Graupner on grounds of lack of standing and judicial estoppel, based on his failure to make proper disclosure to the bankruptcy court in 2000.[5] His affidavit in opposition to the motion, filed on January 19, 2006, stated that he only sought "reinstatement and back pay" from the MLRC, and implied that he did not disclose the MLRC claim to the bankruptcy court because he did not know he had an obligation to do so. He further stated that counsel for his MLRC claim was provided by MASSCOP, and that, shortly after the MLRC's decision in his favor, counsel informed him that she "could only take [him] as far as reinstatement ... [and that he] needed to hire private counsel to pursue any other issues, including back pay and settlement in lieu of reinstatement, and any possible civil rights claims." He stated that he "did not contemplate or consider civil rights claims until informed of those possible rights at that time."

## II. *Analysis*

Defendants seek summary judgment on two grounds: (1) because Graupner failed to schedule his civil rights claims as assets in the bankruptcy court, the claims belong to the bankruptcy estate, and he does not have standing to assert them on his own

behalf; and (2) in any event, Graupner is precluded from asserting them by the doctrine of judicial estoppel. The Court will address each in turn.

### A. *Standing*

Defendants first argue that Graupner's civil rights claims passed to the bankruptcy estate when he filed for bankruptcy on June 7, 2000; that the claims were not disclosed to the bankruptcy court, and therefore never abandoned by that court; that they remain the property of the estate; and that therefore Graupner is without standing to assert the claims in this Court.

As a general rule, a debtor's claims that have accrued as of the date the bankruptcy case commences become property of the bankruptcy estate. 11 U.S.C. § 541(a)(1) (estate includes "all legal or equitable interests of the debtor in property"); *In re Rare Coin Galleries of America*, 862 F.2d 896, 900–901 (1 st Cir.1988); *see generally* 5 COLLIER ON BANKRUPTCY §§ 541.02, 541.08 (15th ed. rev.2005). The "trustee steps into the shoes of the debtor for the purposes of asserting or maintaining" such claims. *Rare Coin Galleries*, 862 F.2d at 901. Thus, each of Graupner's claims that had accrued as of June 7, 2000—the date of his petition—passed to the bankruptcy estate on that date.

■ The debtor is responsible for disclosing all assets to the bankruptcy court, including all contingent claims. 11 U.S.C. § 521(a)(1);[6] *see, e.g., In re Tennyson*, 313 B.R. 402, 406 (Bankr.W.D.Ky.2004) (noting that a purpose of scheduling assets is to

---

5. Defendants did not distinguish in their motion between Graupner's claims that accrued prior to the bankruptcy petition (on June 7, 2000) and those accruing thereafter (e.g., the claims based on the October 21, 2000 detention and subsequent prosecution).

6. This section, formerly § 521(1), has been renumbered as § 521(a)(1) by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, § 106(c)(1), Pub.L. No. 109–8, 119 Stat. 23 (2005).

enable the trustee to evaluate their worth to determine whether the claims should be pursued by the estate). Under 11 U.S.C. § 554(c), any property that is scheduled but not otherwise administered at the time of the closing of a case is abandoned to the debtor; however, property of the estate that is not scheduled in the case, and therefore not abandoned, remains property of the estate. "[A]ny asset not properly scheduled remains property of the bankrupt estate, and the debtor loses all rights to enforce it in his own name." *Jeffrey v. Desmond,* 70 F.3d 183, 186 n. 3 (1st Cir. 1995) (citing *Vreugdenhill v. Navistar Int'l Trans. Corp.,* 950 F.2d 524, 526 (8th Cir. 1991)).

It is undisputed that Graupner did not list any of his claims arising prior to June 7, 2000, on the schedule during the original bankruptcy proceeding; that is, he did not list either his MLRC claim or his civil rights claims, which were based essentially on the same events. He was clearly required to list both.[7] Because the trustee was never made aware of those claims, they could not have been abandoned upon the closing of Graupner's case in September 2000. The claims therefore remained the property of the estate. *See Jeffrey,* 70 F.3d at 186; *Wieburg v. GTE Southwest Inc.,* 272 F.3d 302, 306 (5th Cir.2001).

Graupner argues, however, that he made a proper disclosure to the bankruptcy court in 2005, when he amended his schedule and disclosed the existence of a "civil action for money damages." He contends that when the case was again closed, the claims were abandoned and are therefore no longer property of the bankruptcy estate. *See* 11 U.S.C. § 554(c).

Even assuming complete disclosure, it is at least doubtful whether Graupner's claims could have been abandoned by virtue of the 2005 re-opening, amendment, and closing. Graupner has cited no authority for the proposition that the re-opening of a bankruptcy proceeding five years after its initial closing can cure a failure to disclose an asset in the first instance. Furthermore, because no trustee was appointed, it is not clear that the second closing could act as an abandonment by operation of law under § 554(c).[8]

 In any event, the Court is not satisfied that Graupner's filings in connection with the 2005 amendment were sufficient to satisfy his obligation to disclose his assets to the bankruptcy court. Even in 2005, Graupner did not make full disclosure of his claims. He did not indicate that he had brought not one but *two* sepa-

7. The schedule called for disclosure of "contingent and unliquidated claims of every nature." Both the statutory retaliation claim (which was then pending before the MLRC) and the civil rights claims (which were eventually brought in this Court) easily fit that description. It is true that the relief requested before the MLRC may have been a traditionally equitable form of relief (back pay) rather than a traditionally legal form of relief (compensatory damages). Nevertheless, the cause of action before the MLRC is clearly a "legal or equitable interest of the debtor in property" where the back pay sought was for a period of pre-petition time—November 30, 1999, until June 7, 2000. *See* 11 U.S.C. § 541(a)(1); *see generally* 5 COLLIER at § 541.08 ("causes of action belonging to the debtor at the time the case is commenced" included in bankruptcy estate). Therefore, it would be an asset available to the bankruptcy estate from which his debts could have been potentially satisfied.

8. *Barger v. City of Cartersville,* 348 F.3d 1289 (11th Cir.2003) is distinguishable. There, the plaintiff reopened her bankruptcy to disclose her pre-petition employment discrimination claims in an apparent effort to resolve the standing issue. However, the bankruptcy case remained open and abandonment under 11 U.S.C. § 554(c)—by operation of law upon closing of the case—was not at issue. *See id.* at 1292.

rate proceedings seeking monetary relief—one before the MLRC and one in this Court. He did not indicate that the MLRC proceeding had been *decided in his favor;* that he had been awarded back pay, a substantial portion of which was for a period occurring prior to the petition; and that the decision had been upheld on appeal by the highest court in the Commonwealth.[9] Nor did he estimate the value of either claim. In particular, he did not estimate the value of his MLRC claim, despite the fact that the Town had calculated his total back pay in the amount of $74,240.80 (less amounts received in mitigation); that he had received an offer of more than $86,000 in settlement of the entire claim; or that he refused to accept the offer on the grounds that he believed the value of the claim was far higher. The bankruptcy court was thus left with the false impression that there was a single claim; that it was entirely contingent; that six years had passed without any resolution of the issue; and that the monetary value of the claim was unknown or insignificant.

Under the circumstances, the pre-petition claims were not "properly scheduled" within the meaning of the bankruptcy code. *See Jeffrey,* 70 F.3d at 186; *Tilley v. Anixter Inc.,* 332 B.R. 501, 510 (D.Conn. 2005) (claim for intentional infliction of emotional distress arising from the defendants' failure to pay child support not properly scheduled by virtue of debtor's scheduling of a "back child support" claim); *In re Tennyson,* 313 B.R. at 405–406 (claims for mortgage rescission and for failure to honor mortgage rescission under Truth in Lending Act on a $58,000 mortgage not properly scheduled by virtue of debtors' scheduling of the real property that was the subject of the underlying mortgage or by their scheduling of a "$2,000 TILA" claim); *cf. Barger,* 348 F.3d at 1296 (debtor's oral response to trustee's question regarding the monetary value of her case that "she sought only reinstatement" insufficient to preclude judicial estoppel where she had also sought back pay and various forms of damages).

Because the bankruptcy court never received proper notice of the existence and value of Graupner's civil rights claims, those claims were not abandoned in November 2005. The pre-petition civil rights claims therefore remain the property of the bankruptcy estate and Graupner is without standing to assert them. *See Wieburg,* 272 F.3d at 306.[10]

Before determining what remedy is appropriate, the Court will turn next to the issue of judicial estoppel.

### B. *Judicial Estoppel*

Defendants argue in the alternative that Graupner should be judicially estopped from asserting his claims in this Court. "The doctrine of judicial estoppel prevents a party from asserting a claim in a legal proceeding that is inconsistent with a claim taken by that party in a previous proceeding." *New Hampshire v. Maine,* 532 U.S. 742, 749, 121 S.Ct. 1808, 149 L.Ed.2d 968 (2001) (citing 18 MOORE'S FEDERAL PRACTICE § 134.30 (3d ed.2000)). The purpose of judicial estoppel is to "protect the integrity of the judicial process by prohibiting parties from deliberately

---

9. It is unclear from the record what precise portion of the back pay award accrued prior to the filing of the petition.

10. As noted, Graupner apparently has never collected his back pay award pursuant to his MLRC claim. His ability to collect and retain on his own behalf all or part of that award is not before the Court. Nonetheless, it would appear that any portion of the MLRC award that accrued prior to the date of the petition is likewise the property of the bankruptcy estate.

changing positions according to the exigencies of the moment." *New Hampshire,* 532 U.S. at 749–50, 121 S.Ct. 1808 (citations omitted). The doctrine bars "self-serving self-contradiction, or 'playing fast and loose with the courts.'" *Patriot Cinemas, Inc. v. General Cinemas Corp.,* 834 F.2d 208, 213 (1st Cir.1987).

■ The outer contours of the doctrine are not well-defined, but at a minimum two conditions must be satisfied: (1) "the estopping position and the estopped position must be directly inconsistent, that is, mutually exclusive," and (2) the estopping position must have been accepted by the earlier court. *Alternative System Concepts, Inc. v. Synopsys, Inc.,* 374 F.3d 23, 33 (1st Cir.2004) (citing *New Hampshire,* 532 U.S. at 750–51, 121 S.Ct. 1808).

The facts of this case appear at first blush to satisfy both conditions. First, Graupner took the position in the bankruptcy court that he had no contingent claims of any kind as of June 7, 2000. He asserted in this Court, however, that he is entitled to substantial damages for certain civil rights claims, the great bulk of which accrued before June 2000. Second, the bankruptcy court allowed the discharge of Graupner's debts pursuant to a no-asset bankruptcy, in which the civil rights claims that he now asserts in this Court (as well as his MLRC claims) were neither compromised, litigated, nor abandoned. The bankruptcy court thus accepted his assertion that no such legal claims existed. *See Stallings v. Hussmann Corp.,* 447 F.3d 1041, 1047 (8th Cir.2006) ("A debtor's failure to list a claim in the 'mandatory bankruptcy filings is tantamount to a representation that no such claim existed.'") (citing *In re Superior Crewboats, Inc.,* 374 F.3d 330, 335 (5th Cir.2004)); *Howell v. Town of Leyden,* 335 F.Supp.2d 248, 251 (D.Mass. 2004) (nondisclosure of potential claims in bankruptcy court deprived creditors of access to a substantial potential asset, satisfying prerequisites of judicial estoppel).[11]

Graupner argues that he corrected his prior assertions when he re-opened the bankruptcy proceeding and thereby prevented any injustice from occurring. As noted above, however, the Court does not agree that Graupner made a full and fair disclosure to the bankruptcy court even in 2005. Furthermore, and in any event, the reopening of a bankruptcy proceeding five years after the discharge, and three weeks after receiving notice that defendants intended to file for summary judgment on that basis, does not preclude the operation of judicial estoppel here.

The Eleventh Circuit's opinion in *Barger* involves analogous facts. There, the court stated that disclosure of an asset upon reopening a bankruptcy case during the course of other litigation deserves no weight where the plaintiff only sought to reopen the bankruptcy *after* the defendant filed a motion to dismiss. To hold otherwise "'suggests that a debtor should consider disclosing potential assets only if he is caught concealing them,'" which would only diminish incentives to provide truthful disclosures of the debtor's assets in bankruptcy court. 348 F.3d at 1297 (quoting *Burnes v. Pemco Aeroplex, Inc.,* 291 F.3d 1282, 1288 (11th Cir.2002)). A number of courts in this circuit have similarly acknowledged the proper use of judicial estoppel to estop plaintiff debtors from tak-

---

11. While it may not be strictly necessary to the application of judicial estoppel, the Court notes that Graupner's inconsistent positions clearly afforded him an advantage: a disclosure in bankruptcy court would have presented the possibility that any payment by defendants (either in settlement or by judgment) would have been used to satisfy his debts. By not disclosing the asset, any such payment would be to his sole benefit. *See Patriot Cinemas,* 834 F.2d at 212 (noting advantage to litigant of non-disclosure).

ing positions inconsistent to those taken by them in prior bankruptcy proceedings. *See, e.g., Payless Wholesale Distrib., Inc. v. Alberto Culver (P.R.) Inc.,* 989 F.2d 570 (1st Cir.1993); *Howell,* 335 F.Supp.2d at 248; *Compton v. Depuy Orthopaedics, Inc.,* 2002 WL 1046698, at *1 (D.Mass. May 22, 2002).[12]

 Courts have recognized, however, that a good-faith exception to the operation of judicial estoppel may operate in limited circumstances. The First Circuit has stated that "the exception may be available if the responsible party shows that the new, inconsistent position is the product of information neither known nor readily available to it at the time the initial position was taken." *Alternative System Concepts,* 374 F.3d at 35 (acknowledging existence of doctrine, but declining to invoke it). Graupner asserts that he did not know until 2002—after he had prevailed before the SJC and his then-lawyer informed him that she would take his claims no further than reinstatement—that he may have cognizable civil rights claims against the defendants. He further argues that once he learned of his obligation to disclose his claims to the bankruptcy court, in 2005, he did so.

There is certainly doubt as to whether the good-faith exception applies in these circumstances. Even assuming that Graupner did not have actual knowledge of the existence of his potential civil rights claims before 2002, that information was readily available to him during the pendency of his initial bankruptcy case. *See Alternative System Concepts,* 374 F.3d at 35. Graupner had already filed his MLRC claim, affirmatively stating the nature of

the alleged wrongdoing. He thus knew that he had suffered injury and knew the identity of the alleged wrongdoers. At a minimum, the circumstances should have raised questions in his mind as to whether any other redress for his injuries—including money damages—may have been available to him through any other means. Furthermore, Graupner was represented by counsel throughout this process, both at the MLRC and in the bankruptcy court. He has not argued that he could not have inquired of either counsel about his further rights, or that he was given incomplete or inaccurate advice. In short, Graupner has not articulated any reasonable basis to support a finding that information concerning the existence of his civil rights claims, and of his obligation to disclose them in bankruptcy, was not readily available to him in June 2000.

In any event, for the reasons set forth below, the Court need not decide at the present time whether to invoke the doctrine of judicial estoppel, or the good faith exception, to Graupner's pre-petition civil rights claims.

## C. Remedy

There remains the difficult issue of the remedy for Graupner's failure to disclose his civil rights claims. The Court begins with the proposition that it is duty-bound to protect the integrity of the judicial system, including the integrity of proceedings before the bankruptcy court. That duty certainly takes precedence over any duty to afford a forum to a plaintiff to pursue a civil lawsuit, even a lawsuit involving serious civil rights violations.

---

12. The Court notes that an inference of intentional manipulation of the legal process was required in *Barger,* but that, under *Alternative System Concepts,* no such intent is apparently required in this Circuit. In any event, deliberate manipulation in *Barger* could be inferred where "the debtor has knowledge of the undisclosed claims and has motive for concealment." *Barger,* 348 F.3d at 1294.

Nonetheless, simply dismissing Graupner's pre-petition claims is not an entirely satisfactory result. It would create a potential windfall for defendants, who (if they have engaged in wrongful conduct) may thereby avoid liability altogether. The possibility that defendants engaged in wrongdoing is not simply speculative; indeed, as to the MLRC claim, the defendant Town of Brookfield—based on the actions of its employees—has already been finally adjudicated to have been at fault. Furthermore, dismissal of the claims, at least in theory, may be unfair to Graupner's creditors, who should have an appropriate opportunity to apply any proceeds of those claims to satisfy Graupner's debts. Finally, the Court has concluded that the bankruptcy estate is the real party in interest; under Fed.R.Civ.P. 17(a), " '[n]o action shall be dismissed on the ground that it is not prosecuted in the name of the real party in interest until a reasonable time has been allowed after objection for ratification of commencement of the action by, or joinder or substitution of, the real party in interest....' " *See Vidal v. Doral Bank Corp.*, 363 F.Supp.2d 19, 22 (D.P.R. 2005) (staying dismissal to allow forty-five days for bankruptcy trustee to file motion seeking to substitute for debtor plaintiff; whether plaintiff had yet received discharge was unclear, and plaintiff's bankruptcy petition had only been filed one year earlier).

■ Accordingly, and rather than dismiss the claims outright at this time, the Court will in the first instance provide an opportunity for the bankruptcy court to determine whether it has any interests it wishes to assert or protect. The Court will stay this lawsuit to allow for a reasonable time for the bankruptcy court to consider whether to reopen the case and, if so, whether to appoint a trustee, and for any such trustee to decide whether to pursue the claim as the real party in interest on behalf of the estate. Once that process has been completed, the Court will then consider the appropriate disposition of Graupner's pre-petition claims, including whether it should exercise its equitable powers to dismiss such claims on grounds of judicial estoppel or impose some less draconian form of remedy.

## III. *Conclusion*

For the foregoing reasons, the Court ORDERS as follows:

(a) The Clerk of Court shall provide a copy of this Memorandum and Order to the United States Bankruptcy Court for the District of Massachusetts, Western Division;

(b) Plaintiff Peter Graupner shall have 60 days within which to move to reopen his bankruptcy, for the appointment of a trustee, or otherwise to seek appropriate relief;

(c) This litigation shall be stayed in its entirety for 60 days;

(d) The matter will be set for a status conference on October 17, 2006 at 3:30 p.m.; and

(e) The motion of Defendants for Summary Judgment as to R. Peter Graupner (Docket No. 41) is DENIED without prejudice to its renewal at a subsequent time.

**So Ordered.**